**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**A. G. PARROTT COMPANY, Respondent.**

No. 79–1022.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1980.

Decided Aug. 4, 1980.

Barbara A. Atkin, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, N. L. R. B., Washington, D. C., on brief), for petitioner.

Carrol Hament, Baltimore, Md. (Earle K. Shawe, Baltimore, Md., Warren M. Davison, Washington, D. C., Patrick M. Pilachowski, Shawe & Rosenthal, Baltimore, Md., on brief), for respondent.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and MacKENZIE,* Chief District Judge.

MURNAGHAN, Circuit Judge:

The National Labor Relations Board has applied for enforcement of its order requiring A. G. Parrott Company to bargain with the Laborers' District Council of Baltimore and Vicinity, Laborers' International Union of North America, AFL–CIO. At a consent

---

* The Honorable John A. McKenzie, Chief Judge, United States District Court for the Eastern District of Virginia, sitting by designation.

election held on August 22, 1977, 32 of approximately 37 eligible employees voted. The tally showed 16 ballots cast for representation by the union and 15 cast against representation, with one ballot declared void. Of the 16 "FOR" ballots, one contained a mark generally in the form of a "C" in the "Yes" box on the ballot in lieu of the customary crossmark.

The ballot declared void was marked with an "X" in the "No" box and when opened was first consigned by the NLRB's agent conducting the election to the pile of "No" ballots. However, he removed the ballot from the pile, explaining to the observers of the employer and the union that the ballot was signed and, consequently, under NLRB rules, void.[1] The employer's observer was able to determine by observation of the not totally opaque ballots from the reverse side that there was indeed a mark in the "No" box and that some writing appeared on the ballot. The company's observer requested an opportunity to see the ballot to satisfy himself that a signature in fact appeared upon it. The NLRB agent refused to honor the request.

The Board agent took the ballot which allegedly had been signed with him and it is now in the possession of the NLRB. It is not in the record of this case because, in connection with the employer's protest of the failure to count the ballot and demand that he be allowed the customary right to inspect the ballot to satisfy himself that it was indeed invalid, the NLRB ruled that protection of the anonymity of the person purporting to cast the ballot was too important an objective to have the employee's identity disclosed. The Board did inspect the ballot *in camera* and satisfied itself that the ballot was signed.

The employer also complained, albeit unsuccessfully, of the counting of the "Yes" ballot marked with a "C", arguing that use of so unusual a mark could achieve the same revelation by the voter to either the employer or the union. that the Board rule invalidating signed ballots was designed to prevent.

The company's refusal to bargain with the union, predicated on its contention that certification was improper since the union had not won the election, led to the filing of unfair labor practice charges. Since a tie vote results in a victory for the employer,[2] the employer's position would be sustained if the court were to decide either that the "signed" ballot should have been counted or that the "C" ballot should have been voided. In the absence of either of those decisions, the company was in default under its responsibility to recognize and to enter into good faith bargaining with the union.

■ The more readily disposed of issue is that centering on the "Yes" ballot marked with a "C". Answered in a manner favoring the employer's position, it would afford a disposition without necessitating inquiry into the more tangled question of the proper treatment to be accorded the "No" ballot which was purportedly signed. However, the "Yes" ballot manifestly was properly counted in favor of the union. There is nothing in the record to indicate that the "C" in any way operates to reveal the identity of the employee who cast the ballot. No reason for invalidating it, therefore, has been shown. The voting preference is clear. We discern, therefore, no sufficient reason to fault the NLRB for counting the ballot. *Cf. N. L. R. B. v. Tobacco Processors, Inc.*, 456 F.2d 248 (4th Cir. 1972) (per curiam); *N. L. R. B. v. Titche-Goettinger Co.*, 433 F.2d 1045 (5th Cir. 1970).

■ It, consequently, is necessary for us to direct attention to the matter of the consequences of the treatment given to the "No" ballot which apparently was signed.

---

1. The possibility of coerced voting, with the employee's use of his signature to verify that he had done as he was told rather than exercise his unfettered right of free choice underlies the rule. "In the Board's view, voter identification on the ballot would permit undue pressure to be exerted on employees." *N. L. R. B. v. Wrape Forest Industries, Inc.*, 596 F.2d 817, 818 (8th Cir. 1979) (*en banc*).

2. *See, e. g., N. L. R. B. v. Schapiro & Whitehouse, Inc.*, 356 F.2d 675, 678 (4th Cir. 1966).

The NLRB agent's approach differed from the customary one in such cases. Ordinarily the way in which the employee had voted has been hidden but the writing constituting the signature has been revealed so that each party could satisfy himself that, the ballot was in fact signed. The position of the NLRB has been, in effect, that two facts need to be known before revelation of how an employee has voted can be disclosed, i. e., both (a) his identification and (b) the way in which he had voted. It was customary practice for the NLRB representative to disclose who the voter was but to conceal the manner in which he had voted. Since the fact that his identity was disclosed sufficed to void the ballot whichever way he had voted, the nature of his vote was not of any significance to the parties.[3]

Once the NLRB agent introduced the complicating factor of disclosure as to how the "signed" ballot had been voted, he, no doubt inadvertently, created a mistake impossible to correct completely. The first reaction is that the parties, absent the NLRB agent's error, had generally been granted the right to inspect the ballot, and in that connection see the employee's name, rather than having to take the NLRB's word that the ballot had in fact been signed. Why not let the employer and union do what they normally do, since the complicating factor was introduced solely by the NLRB's error and not by either of the parties? If such an approach had been followed, it is very probable that the fact of signature and consequent invalidation of the ballot would have been established, and the question eliminated from the case.

However, such an approach was unacceptable to the NLRB, which reasoned that to do so would allow both the employer and the union, then knowing not only that he had signed, but how he had voted, to pierce the secrecy surrounding the ballot of the employee who purportedly signed. So the NLRB refused the employer's request that it be allowed to do what was customary in the case of signed ballots, i. e., to inspect the ballot, with the signature, and hence the identity of the voter, fully disclosed.

Therefore, the NLRB adopted, for this exceptional case, the solution of denying the employer the right, generally granted, to see the signature, and requiring that he accept the NLRB's conclusory statement that it was in fact an invalidating signature in blind faith, abandoning a protection of inspection otherwise routinely available.

As a general matter it seems that all suspect ballots are customarily available to both the employer and the union so they may each satisfy themselves as to whether invalidating irregularities exist. Even in the case of a signature, everything but the manner of voting itself is shown, and the matter of validity or invalidity is susceptible of resolution without regard to how the employee has voted.[4] In this case, however, the NLRB seeks to enforce an exception not applicable generally, but solely for a specific case,[5] to correct an isolated error of the NLRB agent.

---

3. It merits mention that the employer mounts no generalized attack on the rule that a signed ballot is void. It is only because of the exceptional refusal by the NLRB to let it see the ballot to satisfy itself whether or not there had in fact been a signature rather than some other writing which does not "inherently disclose the identity of the voter. . . ." *Knapp-Sherrill Co.*, 68 LRRM 1286 (1968). *But see N. L. R. B. v. Wrape Forest Industries, Inc.*, 596 F.2d 817, 818 (8th Cir. 1979) (*en banc*) (Rule invalidating signed ballots is itself of "dubious validity in disenfranchising eligible voters, as the voter's name need not be disclosed by the Board to either of the parties.") (*dictum*); *cf. id.* at 820 (Lay, J., dissenting) (invalidation of signed ballots within Board's discretion).

4. The Board first considered the question of the consequences of signed ballots in *Burlington Mills*, 56 N.L.R.B. 365, 367-68 (1944). In *Burlington Mills*, the company had moved the trial examiner to produce for inspection and to include in the record four signed ballots. The trial examiner overruled the motion and the Board affirmed. On reconsideration, however, the Board reversed its prior ruling and "made said ballots a part of the record of the hearing on objections as Board's Exhibit No. 2, available to all parties for inspection . . . ."

5. It is not necessary to decide, and we refrain from expressing an opinion as to whether for some other purposes, as a general matter, the NLRB by rule could restrict access to ques-

There are several considerations which render that approach questionable. First, why should one of the parties bear the unfavorable consequences when it did not make the mistake? Either the signing employee or the NLRB agent, or both to some degree, were to blame. But neither the union nor the employer was at fault.[6]

Second, since the end result of the NLRB's approach for this particular case is to conceal the signer's identity, if such concealment is proper why should not the vote be counted rather than voided? The NLRB's answer is that the possibility of coerced voting is still present whether the employee's name is disclosed or not. That interesting question, centering as it does on the importance of protecting and assuring wherever possible the enfranchisement of the worker/voter, and the possibility that the NLRB's disenfranchisement of the "No" vote here could as well have proceeded from a display of confusion, or misplaced pride, or arrogant independence on the part of the worker, as it did from coercion, need not and should not be answered here, however.[7] If the "No" ballot were counted, the injustice to the union in counting a ballot assertedly signed, without affording it the opportunity otherwise routinely provided to inspect to determine the presence of a normally invalidating signature or other flaw requiring invalidation, would be as great as the injustice to the employer.

Hence we are left with a ballot against which unresolved substantial arguments exist both for counting it and against counting it. Since the ballot, depending on whether it is counted or not, is decisive of the outcome, we are of the persuasion that the election should not be deemed to have been regularly conducted. An essential ballot has been placed in an anomalous position, actually a position in limbo. We, therefore, hold that, certification of the union as the prevailing party in the August 22, 1977, election was error.[8] It follows that the employer had no duty to bargain and that the request for enforcement of the order requiring it to do so should not be granted. However, it appears to us that the circumstances imperatively warrant the holding of another election, to permit a determination free of error, in which all ballots can properly be determined to be valid or invalid, and a proper decision made as to the outcome.[9]

ENFORCEMENT DENIED.

JAMES DICKSON PHILLIPS, Circuit Judge, dissenting:

During the vote count following a small, 32-voter representation election, two ballots

---

tioned ballots for inspection in cases expected to come up again and again, rather than as an isolated exception, in order to further some general duty or obligation imposed by statute on the NLRB.

6. It is by no means necessary to criticize the NLRB's action as equivalent to a Star Chamber proceeding. Nevertheless, its approach in this case evinces a tendency towards the illfavored practices of that tribunal. *But cf. General Shoe Corporation*, 77 N.L.R.B. 124, 127 (1948):

In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees. It is our duty to establish those conditions; it is also our duty to determine whether they have been fulfilled. When, in the rare extreme case, the standard drops too low, because of our fault or that of others, the requisite laboratory conditions are not present and the experiment must be conducted over again.

7. *See* n. 3, *supra.*

8. Courts should be "slow to overturn an administrative decision," . . ., but they are not left "to 'sheer acceptance' of the Board's conclusions," . . . . Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions. *N. L. R. B. v. Brown*, 380 U.S. 278, 291, 92 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).

9. *Cf. Kal-Equip Co. v. N. L. R. B.,* (Nos. 77–1526, 78–1532 unreported order 11/21/79), *enf. denied*, 611 F.2d 372 (6th Cir. 1979) (New election ordered where postal service delayed parties' receipt and posting of Board's notice of election.).

show up with possible invalidating irregularities. Each possible irregularity is separately revealed while the supervising Board agent is taking the ballots from the ballot boxes and sorting them into "yes" and "no" piles for tallying. Each is acted upon by the agent before proceeding further in his sorting, and of course before the final tally is made.

One, marked for the company, is seen by the agent to bear the signature of a voter. The cast of this ballot, but not the signature, is seen by company and union representatives. After some discussion, the agent sets this ballot aside as void under a general Board rule invalidating all signed ballots. Sorting proceeds.

The other, marked for the union, is not marked as are all others by the traditional "x" or check mark, but by a mark like a slightly canted letter "c." The company representative objects to this ballot on the basis that it is not appropriately marked. After some discussion, the agent rules that it is a valid "yes" vote and proceeds.

When, following sorting, the resulting thirty-one ballots are counted, there are sixteen votes for the union, fifteen for the company. As things have developed, had the "c" vote for the union not been counted, or the signed ballot for the company been counted, the election would have been won by the company rather than the union.

Inevitably, legal challenge ensues. The Board considers the company's objections to the agent's handling of these two ballots, and upholds his action in respect of each. Declining, as had the agent, to reveal the identity of the voter who signed the invalidate ballot, the Board verifies the fact of its signature by *in camera* inspection.

The case is presented to us for review of the Board's administrative determination overruling the company's objections and certifying the union as the exclusive bargaining representative by virtue of the election results. The question in effect is whether by reason of the handling of these two administrative problems in the processing of ballots, an otherwise regular representation election shall be set aside by judicial review.

Our scope of review is exceedingly narrow: "The conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse." *NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970). This reflects the fact that Congress had deliberately "entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946).

Of course this cannot be thought to confine us to rubber stamping any and all Board actions in conducting representation elections. We have, and have freely exercised, the power to determine that "glaring discrimination or abuse" has taken place, or that there is such a likelihood that abuse of the election process has occurred that the Board must conduct searching factual inquiry into a possibility sufficiently suggested to us. *E.g., Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 594 F.2d 8 (4th Cir. 1979). But neither can it be thought to empower us simply to second-guess exercises of administrative judgment which we cannot fairly characterize as involving abuse or discrimination. We do not review for mere exercises of poor or questionable judgment against a standard of what we would have done had it been our assigned task—which it is not—to administer representation elections under the National Labor Relations Act. In my view our power should never be thought to extend to the solomonic expedient of ordering a new election simply because of vague uneasiness about the wisdom of particular policies or administrative determinations[1] which in

---

1. The majority is to some extent concerned about the refusal of both the agent and the

Board to reveal the voter's signature to allow verification by the company that it had actually

retrospect can be seen to have tipped the scales in a close election.[2] In such cases, it seems to me particularly important that we concentrate our inquiry upon the context in which the policy was laid down or the action taken, though of course with the understanding as of that time that it might be decisive in a close election. If it would pass muster then as a rationally supportable choice between hard alternatives, not arbitrary, capricious, abusive or discriminatory as a matter of our considered judgment, then we should let stand even that administrative choice which all of us involved in the judicial review would consider simply wrong.

On this basis, I cannot see either of the administrative determinations under challenge here as abusive or discriminatory exercises of the discretion given the Board and its agents. The majority agrees that counting the "c" marked ballot could not be so considered. We disagree then as to the action on the signed ballot. Under my view our inquiry as to this should be whether, at the time the agent made his determination to void it, this was a rational choice between the possible alternatives or an arbitrary, capricious, patently discriminatory choice. To me it seems quite clear that it must be counted the former rather than the latter.

The rationality, hence the nonarbitrariness, of the choice can best be measured against the company's specific contention on the point. The company does not contest the general rule, born of the statutory requirement that representation elections be by secret ballot, 29 U.S.C. § 159(c)(1), that signed ballots are void. It argues, however, that because of the peculiar circumstances, either its representatives should have been allowed to inspect the ballot to verify that the writing on it was a signature, or the signed ballot should have been counted.

As we were advised by Board Counsel on oral argument, the normal procedure for dealing with a signed ballot would be for the agent to cover the vote and show the union and company representatives the signature. Here, however, the agent did not notice that the ballot had been signed until the cast of the vote had been revealed. The problem created by this inadvertent revelation had no happy solution. Had the agent allowed the company's counsel to see the signature he would have revealed not only the identity of the voter but his vote. By refusing to allow the ballot's inspection, however, the agent put the company in the position of having to accept his assertion and the Board's later *in camera* determination that the ballot was signed. The choice between revelation and nonrevelation was admittedly a hard one, but I cannot see the nonrevelation choice as an irrational, arbitrary one.

The company argues alternatively that since this ballot was kept secret, the vote should be counted. Again, the agent's decision, upheld by the Board, both to void and not to disclose voter identity seems to me not an arbitrary one, abusive of administrative discretion, under the circumstances.

First, the Board might reasonably conclude that deviations from the rule on the basis of such chance occurrences would inject intolerable uncertainty into election procedures. Results would turn on fortuitous events such as the fact that here the

occurred, and the company now suggests that the Board failed adequately to safeguard this ballot. But the company did nothing—so far as I can tell—to invoke the available administrative procedures for challenging the ballot which would have provided safeguards. Neither has it invoked available appellate procedures that would have permitted our *in camera* confirmation of the fact of signature as determined *in camera* by the Board. I am bound to conclude that there is no genuine dispute on the matter.

2. As opposed to situations such as that revealed in *Kal-Equip Co. v. NLRB*, No. 77--1526 (6th Cir., Nov. 21, 1979) (order denying enforcement), cited by the majority, where the integrity of the whole election process might have been jeopardized by a delayed notice of the election. In such a situation a new election might well be the appropriate and only remedy for the Board's arbitrariness in allowing election to proceed. We have no such suggestion of wholesale irregularity of the election here.

cast of the vote was revealed to observers before the agent noticed the existence of a voiding signature. A basically absolutist approach to a voting procedure rule so fundamental and so well understood by all interested parties does not of itself bespeak administrative arbitrariness. Rather, it seems wholly justified as a rational means for insuring order and certainty of consequences in the procedures.

Second, and more importantly, the purpose of the rule is not merely to prevent the parties from learning the identity of the voter, but to prevent the voter from attempting to reveal it. The latter focus of the rule is demonstrated in several cases in which the identity of the voter became known, but not as the result of efforts by the voter. In *Abbott Laboratories, Ross Laboratories Division v. N.L.R.B.*, 540 F.2d 662 (4th Cir. 1976), an employee revealed the marking on his ballot as he placed it in the ballot box. Because the revelation had apparently been inadvertent, this court found no error in counting the vote. *Id.* at 665 n.1.

In *International Union of Electrical, Radio and Machine Workers v. N.L.R.B.*, 418 F.2d 1191 (D.C. Cir. 1969), the name of one employee was written on the outside of the envelope containing his ballot. Under the peculiar circumstances of the case both the union and the employer knew that that employee had voted for representation by the union. Nonetheless, the court held that the Board could not count that employee's vote until it had made a factual determination that it was not the employee who had written his name on the envelope, or that he had not done so improperly to identify his ballot. It did not matter that the employee's vote was in fact known:

> The point of the rule is to eliminate all ballots which the voter appears to have tried to identify as his own, giving rise to the implication that he may be complying with the threats or satisfying the inducements of one of the parties to the election. As the Board says in its brief, ballots are disqualified where "the voter

apparently *wanted* to be identified with his vote." (Emphasis by the Board.) *Id.* at 1202.

As these cases reveal, the rule's legitimacy does not rest alone upon the maintenance of secrecy of ballots so that it can be disregarded once secrecy is assured by other means. It rests as well upon the need to prevent or at least discourage efforts by employees to signal their votes for whatever reason. The Board and its agents might reasonably act on the assumption that this latter purpose can only be served by consistent application of the sanction of voiding all ballots intentionally identified by voter name.

Here, no suggestion has been made that the signed ballot was not intentionally signed by the voter. Accordingly, the Board did not abuse its administrative power in treating the ballot as void notwithstanding the fact that the identity of the voter was not revealed to either party in interest.

I would grant enforcement, and so respectfully dissent.