DAVID A. NELSON, Circuit Judge.
 

 This is a labor relations case that involves the validity of a representation election. The union won the election by a single vote, and the main issue before us is whether the National Labor Relations Board acted improperly in counting a questionably marked ballot. • We conclude that it did not, and we shall grant the Board’s application for enforcement of an order requiring the employer to bargain with the union. ■
 

 I
 

 The United Steelworkers of America, AFL-CIO, filed a petition with the Board seeking certification as the collective bargaining representative of certain employees of the Duriron Company at a manufac-
 
 *256
 
 taring plant in Cookeville, Tennessee. On July 21, 1989, the Board conducted a secret-ballot election in the lunchroom of the plant. The polls were open from 7:30 a.m. to 8:30 a.m. and from 3 p.m. to 4:30 p.m. The election was supervised by Thomas O’Connor, an agent of the Board.
 

 Both Duriron and the union had two election observers. One observer from each side- remained in the voting area, while the other two went out to inform employees that the polls were open.
 

 A few minutes before the second voting session began, Board Agent O’Connor left the polling area. The observers remained there with the ballot box.
 

 During the second session several employees who wore union shirts and hats congregated outside the voting area to solicit employees who were about to vote. On two occasions Board Agent O’Connor had brief conversations with employees wearing union shirts and hats in the presence of other employees waiting in line to vote.
 

 After the election was over, but before the full count was known, Mr. O’Connor declared one ballot void. ■ Without this ballot, it turned out, the election was tied at 85 votes for representation by the union and 85 votes against'.
 

 The ballot in question, like all others used in the election, read “OFFICIAL SECRET BALLOT” and instructed voters to mark an “X” in the square of their choice. This particular ballot had a mark, wholly contained within the box ■ designated for votes in favor of union representation, that can be interpreted either as an “X,” a “C” with a line through it, a “4,” a check mark with a line drawn through it to convert it into an “X,” or an “X” made with a flourish. A copy of the ballot is set forth as an appendix to this opinion. Board Agent O’Connor apparently thought the somewhat unusual mark might serve to identify the voter who cast the ballot, which would be grounds for rejection.
 

 The union challenged the agent’s rejection of the ballot. Duriron also filed objections, asserting, among other things, that union supporters had engaged in electioneering at or near the polls; that the Board agent had left the unsealed ballot box unattended for a few minutes; and that the agent had openly fraternized with union supporters.
 

 After conducting an investigation, the Board’s Regional Director recommended that the contested ballot be counted as a valid “Yes” vote; that certain of Duriron’s objections be overruled; and that other objections be examined at a hearing. A hearing officer subsequently recommended that Duriron’s objections be overruled in their entirety, and the Board accepted the recommendation and certified the union as the exclusive representative of the employees in the bargaining unit. If the contested ballot had not been counted, of course, the union would not have been certified.
 

 Duriron refused to bargain with the union, and the Regional Director issued a complaint charging the company with having violated §§ 8(a)(5) and 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and 158(a)(1).
 
 [1]
 
 , The Board issued a decision and order granting summary judgment against the company, and an application for enforcement of the Board’s order was filed in this court on December 10, 1991.
 

 II
 

 The Board strives to maintain “laboratory conditions” during representation elections. See
 
 General Shoe Corp.,
 
 77 N.L.R.B. 124, 127 (1948),
 
 enforced,
 
 192 F.2d 504 (6th Cir.1951),
 
 cert. denied,
 
 343 U.S. 904, 72 S.Ct. 635, 96 L.Ed. 1323 (1952). “Laboratory conditions” are not always achieved in practice, and elections are not automatically voided whenever they fall short, of perfection. The Board has broad discretion to determine whether the circum
 
 *257
 
 stances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union. See
 
 Amal. Serv. & Allied Indus. Joint Bd. v. NLRB,
 
 815 F.2d 225, 227 (2d Cir.1987).
 

 A
 

 The task of analyzing the somewhat unusual mark on the contested ballot in this case leads us into a thicket of prior decisions addressing stray or unusual marks,
 
 NLRB v. A. G. Parrott Co.
 
 , 630 F.2d 212 (4th Cir.1980), smiling faces,
 
 Sioux Products, Inc. v. NLRB,
 
 703 F.2d 1010 (7th Cir.1983), extraneous words,
 
 Mycalex Division of Spaulding Fibre Co. v. NLRB,
 
 481 F.2d 1044 (2d Cir.1973), and erased marks,
 
 Abtex Beverage Corp.,
 
 237 N.L.R.B. 1271 (1978). Although the prior decisions do not seem entirely consistent, they are in general agreement on certain fundamental principles.
 

 A ballot should normally be counted if there is a clear expression of preference, regardless of an irregularity in the voter’s mark. See
 
 NLRB v. Connecticut Foundry Co.,
 
 688 F.2d 871, 875 (2d Cir.1982) (citing
 
 NLRB v. Wrape Forest Indus., Inc.,
 
 596 F.2d 817 (8th Cir.1979) (en banc)). A ballot has thus been counted when it was blank on its face but had the word “no” written on the back,
 
 NLRB
 
 v.
 
 Tobacco Processors, Inc.,
 
 456 F.2d 248 (4th Cir.1972), when the words “Do I ever” were scrawled across the bottom,
 
 NLRB v. Martz Chevrolet, Inc.,
 
 505 F.2d 968 (7th Cir.1974), and when the letter “C” was written on the ballot,
 
 NLRB v. A.G. Parrott Co.,
 
 630 F.2d 212 (4th Cir.1980). The voter’s intent must ordinarily be given effect if it is reasonably discernible. See
 
 Wackenhut Corp. v. NLRB,
 
 666 F.2d 464, 467 (11th Cir.1982) (citing
 
 NLRB v. Titche-Goettinger Co.,
 
 433 F.2d 1045 (5th Cir. 1970)).
 

 There is an important exception to this general rule. A ballot that is unambiguous as far as the voter’s preference is concerned will still be rejected if the mark identifies the voter. The Board does not' want employees to be able to take credit with management or with the union for having voted one way or the other in a contested election. The Board has thus voided ballots marked with a capital “H”,
 
 NLRB v. National Truck Rental Co.,
 
 239 F.2d 422, 426 (D.C.Cir.1956),
 
 cert. denied,
 
 352 U.S. 1016, 77 S.Ct. 561, 1 L.Ed.2d 547 (1957), or with a number,
 
 Norris-Thermador Corp.,
 
 118 N.L.R.B. 1341 (1957). In general, however, the Board has invalidated only ballots with markings that could
 
 reasonably
 
 be expected to identify the voter. See
 
 Sioux Products, Inc. v. NLRB,
 
 703 F.2d 1010, 1017 (7th Cir.1983). Not “every
 
 possibly
 
 identifying mark serves to disqualify a voter.”
 
 Int’l Union of Elec., Radio & Mach. Workers v. NLRB,
 
 418 F.2d 1191, 1202 (D.C.Cir.1969) (emphasis supplied). And the First Circuit has noted in this connection that one glance may be worth a thousand words. See
 
 NLRB v. Newly Weds Foods, Inc.,
 
 758 F.2d 4, 12 (1st Cir.1985).
 
 [2]
 

 The mark made on the ballot at issue here was totally contained within the “yes” box, and the- Board concluded that the mark manifested the voter’s intent to vote for the union. Duriron does not seriously challenge this determination, but argues that because the mark
 
 might
 
 be a “4” and because there is an employee with that time clock number, the secrecy of the ballot was compromised even if there was no prearranged code.
 

 
 *258
 
 The argument is ingenious but unpersuasive. The Board’s policy is to disqualify ballots where the voter apparently
 
 wanted
 
 to be identified with his vote. See
 
 I.U.E. (Liberty Coach Co.) v. NLRB,
 
 418 F.2d 1191, 1202 (D.C.Cir.1969). There is no evidence that the employee whose clock number was “4” marked this particular ballot and wanted to be identified with his vote. The possibility that the union could identify the voter from such a ballot seems more, remote, moreover, than the possibility that the handwriting of the employee who wrote “Do I ever” on a ballot could be used to identify him. See
 
 Martz Chevrolet,
 
 where the “Do I ever” ballot was held to be valid.
 

 B
 

 Between 3 p.m. and 3:30 p.m. on the day of the election as many as 12 union supporters, some wearing shirts with pro-union legends, gathered in the hallways within 20 feet of' the doors leading to the cafeteria where polling was taking place. Some of the union supporters went into the employees’ work areas to discuss union benefits and higher wages. Between 3:30 p.m. and 4 p.m. some employees gathered within 15 feet of the cafeteria doors. Although these employees could be heard within the cafeteria, their words could not be understood by people in the voting area.
 

 In
 
 Claussen Baking Co.,
 
 134 N.L.R.B. 111 (1961), the Board ordered a new election where an employee, standing with two management officials some 15 feet from the polls, engaged in systematic electioneering and urged newly hired employees to vote against the union. In
 
 Milchem, Inc.,
 
 170 N.L.R.B. 362, 362 (1968), the Board prohibited “prolonged conversations between representatives of any party to the election and voters waiting to cast ballots.”
 

 The Board has long distinguished between electioneering by parties at a polling place and non-party electioneering at or near the polls. In the latter case, “the Board makes a judgment, based on all facts and circumstances, whether the electioneering substantially impaired the exercise of free choice so as to require the holding of a new election.”
 
 Certainteed Cory. v. NLRB,
 
 714 F.2d 1042, 1063 (11th Cir.1983) (quoting
 
 Glacier Packing Co.,
 
 210 N.L.R.B. 571, 573 n. 5 (1974) (citation omitted)).
 

 In the instant case the electioneering was not carried on by union- employees but by Duriron employees.. No prolonged conversations occurred. Coercion was not as readily apparent as in
 
 Claussen
 
 because the employees were not flanked by management personnel. The line of voters never extended beyond the cafeteria doors, so the electioneering in this cáse cannot be said to have been directed at employees waiting in line.
 
 NLRB v. Carroll Contracting and Ready-Mix, Inc.,
 
 636 F.2d 111 (5th Cir.1981), is inapposite here for that reason. See also
 
 Boston Insulated Wire & Cable Sys., Inc. v. NLRB,
 
 703 F.2d 876, 881-82 (5th Cir.1983) (electioneering by union agents did not interfere with employees’ free choice where it occurred away from the polling place and was not directed at employees waiting in line to vote). The Board’s finding that the presence of some pro-union employees in the hallway outside the voting area did not interfere with employees’ free choice is not one that we are free to reject on the record before us.
 
 [3]
 

 C
 

 Pointing to the Board agent’s brief conversations with the employees and to his having left the ballot box area for a short time, Duriron argues that the Board failed to maintain- the required integrity and neutrality of the election process. Again we are not.persuaded.
 

 During the afternoon voting session employee Bob West, who was wearing union insignia, reported to vote. After West announced his name, the agent asked him if Gwen West were his wife. Later during the balloting the agent spoke to Terral
 
 *259
 
 West, another employee wearing union insignia. The agent asked if he were Gwen West’s son and told him that he had taken an affidavit from Gwen West in another case. Gwen West was not a Duriron employee.
 

 The Board concedes that the conversations were contrary to Board policy. In assessing a challenge to the integrity of the election process in circumstances such as those presented here, however, the Board determines whether, on the facts of the case, “the manner in which the election was conducted raises a reasonable doubt as to the fairness and validity of the election.”
 
 Polymers, Inc.,
 
 174 N.L.R.B. 282, 282-83,
 
 enforced,
 
 414 F.2d 999 (2d Cir.1969),
 
 cert. denied,
 
 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970). Here the agent did not indicate his views about the union or discuss Duriron or the election. We cannot say that the Board was wrong in its determination that the agent’s conversations failed to compromise the integrity of the election.
 
 [4]
 

 Although the agent left the vicinity of the election box for a short time, the box was under the scrutiny of observers while the agent was away. The Board found that the seal on the ballot box had not been broken and that no employees entered the polling area during the agent’s absence. On these facts, again, we cannot say that the Board should have found that the integrity of the election was vitiated. See
 
 NLRB v. Oesterlen Servs. for Youth, Inc.,
 
 649 F.2d 399, 400 (6th Cir.),
 
 cert. denied,
 
 454 U.S. 1031, 102 S.Ct. 567, 70. L.Ed.2d 474 (1981). Cf.
 
 Austill Waxed Paper Co.,
 
 169 N.L.R.B. 1109 (1968) (election set aside when Board agent left
 
 unsealed
 
 ballot box unattended for two to five minutes).
 

 Viewing the record as a whole, and considering the totality of .the circumstances, we are not persuaded that the Board was required to find that the election was fatal: ly tainted. The Board’s application for en-foi-cement of the order requiring Duriron to bargain with the union is GRANTED.
 

 
 *260
 
 [[Image here]]
 

 [1]
 

 . Because representation proceedings are not directly reviewable by the courts, see
 
 Am. Fed’n of Labor v. NLRB,
 
 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), an employer that wants a judicial determination of the fairness of an election must refuse to bargain with the victorious union. The validity of the election can then be challenged in the ensuing unfair labor practice proceeding.
 

 [2]
 

 . Agreeing with the decisions last cited, we decline to follow the expansive decision in
 
 Laconia Malleable Iron Co.,
 
 95 N.L.R.B. 161 (1951), where the Board held that markings that
 
 might
 
 have been deliberately made, and
 
 might
 
 have served to reveal the identity of the voter, will void a ballot. Almost any stray mark could identify a voter who had agreed that such a mark would serve as a code, but a nervous twitch or an unintentional error in penmanship should not by itself void a ballot or change the results of an election. If a voter had wanted to identify himself to the union in the case at bar, he could have made a mark much more subtle than the one before us. The
 
 Laconia
 
 rule will not catch the clever cheater, and will disenfranchise too many innocent voters.
 
 Cf. NLRB v. Nat'l Truck Rental Co.,
 
 239 F.2d 422, 426 (D.C.Cir.1956) (ballot valid where marking looked like "B" or "J" and appeared to be accidentally made),
 
 cert. denied,
 
 352 U.S. 1016, 77 S.Ct. 561, 1 L.Ed.2d 547 (1957).
 

 [3]
 

 . The fact that the Board agent did not intervene to stop the electioneering does not warrant denying enforcement of the Board’s order. Although it might have been prudent for the agent to intervene, the fact that the agent failed to do so is not dispositive. See
 
 Amal. Serv. & Allied Indus. Joint Bd. v. NLRB,
 
 815 F.2d 225, 231 (2d Cir.1987).
 

 [4]
 

 . The level of fraternization in this case does not rise to that in
 
 Athbro Precision Eng’g Corp.,
 
 166 N.L.R.B. 966 (1967),
 
 enforced,
 
 423 F.2d 573 (1st Cir.1970), where the Board agent in charge of the election drank a beer with one of the union’s representatives during a break in the polling.