SIOUX PRODUCTS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 81–2728.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1982.

Decided March 24, 1983.

George P. Blake, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for petitioner.

Michael Fischl, Elliott Moore, N.L.R.B., Washington, D.C., for respondent.

Before PELL, BAUER and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge.

This might be referred to as the "Smiling Face" ballot case. Much as in the nursery rhyme that "for lack of a nail a kingdom was lost", here the insertion of a "smiling face" on one of 105 ballots in a union representation election, together with another signed ballot, have cast in doubt the validity of the entire election.

The National Labor Relations Board ("Board") applies pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1976) ("Act"), for enforcement of its bargaining order, 258 N.L.R.B. 287 (1981), issued on September 25, 1981 against Sioux Products, Inc. ("Company"). The Company petitions to review that order. For the reasons stated below, we deny en-

* Of the Second Circuit, by designation.

forcement and remand the case to the Board for further proceedings in accordance with this opinion.

## I.

The dispute arises from a representation election held on February 1, 1980 at the Company's Addison, Illinois, facility where plastic injection molding parts are made. Of the 105 ballots cast, 52 unchallenged ballots were cast for Local 707 of the National Production Workers Union ("Union"), 44 unchallenged ballots were cast against the Union, 7 ballots were unopened due to challenges by the Union on the basis of voter eligibility, and 2 ballots which had been marked with an "X" in the "No" square subsequently were ruled void by the Regional Director because of extraneous markings on the ballots.

The first of the latter two was invalidated by the Board agents who conducted the election because the voter had signed her name on the ballot; the other was invalidated, over the Company's protest, by the Regional Director because an employee had sketched a smiling face under the "X" in the "No" box (See Exhibit A appended to this opinion). Since invalidation of the 2 ballots left the Union with a majority of valid ballots cast, the Regional Director did not rule on the 7 challenged ballots. Under the Board's challenge procedure, ballots are cast but not counted pending future determination of their validity. The Regional Director, however, did order a hearing on the Company's objection that Board agent misconduct skewed the election results. After two days of hearings, the Hearing Officer recommended overruling the objection and sustaining the election result. The Board adopted the Hearing Officer's recommendation.

After the Board certified the Union as the bargaining representative of the Company's production and maintenance employees at its Addison facility, the Company refused to bargain with the Union. The Company refused to bargain on the ground

of the alleged impropriety of the certification. It asserted, in its answer to the General Counsel's complaint and it contends on this review, that the election should be set aside due to the misconduct of Board agents before, during, and after the election. Second, it asserted, and continues to do so on this review, that the Board erred in invalidating the two disputed ballots with the extraneous markings. Since the validity of either one of the ballots might leave the Union short of a majority if the other 7 challenged votes were counted and were votes against the Union, the Company argues that the other 7 ballots must be tallied on remand.

We hold that substantial evidence in the record supports the Board's determination that Board agents' misconduct did not tarnish the election.[1] We further hold, however, that the Board improperly invalidated one of the disputed ballots. Accordingly, we remand the case to the Board for a determination of whether the 7 challenged ballots should be tallied.

## II.

■ Turning first to the issue of alleged Board agent misconduct, the Company asserts that the Board agents who supervised the election, particularly agents Paula Goodgal and Craig Wilson, manifested such a bias in favor of the Union that the "laboratory" conditions of the election were spoiled. Specifically, the Company asserts that Goodgal showed unwarranted hostility towards Company observer Brent Borgerson and those employees who attempted to contact him during the election, that Good-

gal grossly mishandled an Italian-speaking employee's attempt to vote, that both Board agents impermissibly aided Union observer Julia Arroyo in challenging allegedly ineligible voters, and that they unfairly conducted the ballot counting procedure at the conclusion of the election. The Company filed timely objections to the Board agents' conduct. A hearing was held in June 1980 before a Hearing Officer from a different regional office.[2]

■ Although a party moving to set aside a certified election because of Board agent misconduct must sustain a heavy burden of proof, *NLRB v. Fenway Cambridge Motor Hotel*, 601 F.2d 33, 36–37 (1st Cir. 1979), the principles governing Board agent conduct demand strict impartiality. As the Board itself has stated:

"The Board in conducting representation elections must maintain and protect the integrity and neutrality of its procedures. The commission of an act by a Board agent conducting an election which tends to destroy confidence in the Board's election process, or which could reasonably be interpreted as impugning the election standards we seek to maintain, is a sufficient basis for setting aside that election."

*Athbro Precision Engineering Corp.*, 166 N.L.R.B. 966 (1967), *vacated sub nom. I.U.E. v. NLRB*, 67 L.R.R.M. 2361 (D.D.C. 1968), *acquiesced in*, 171 N.L.R.B. 21 (1968), *enforced, NLRB v. Athbro Precision Engineering Corp.*, 423 F.2d 573 (1st Cir.1970). Board agent conduct which casts doubt upon the fairness of the election results or

---

1. This Court's recent opinion in *Mosey Mfg. Co. v. NLRB*, 701 F.2d 610, 615 (7th Cir.1983), established the pertinent standard of review—Board decisions involving election procedures are scrutinized under a "substantial evidence" standard.

2. The Company also asserts that it was entitled to a hearing before an Administrative Law Judge, rather than before a Hearing Officer who is another Board attorney. The Company acknowledges that the Board's regulations provide for a hearing on objections before a Hearing Officer, 29 C.F.R. § 102.69(d) (1982), and it does not claim that the hearing itself was pro-

cedurally flawed. Rather, it asserts that the Hearing Officer's potential conflict of interest between her loyalty to other Board employees and her duty as an impartial fact-finder denied the Company due process. It is not unusual, however, for agency hearing examiners to preside over cases in which the agency has been charged with misconduct, *see, e.g., Abbott Laboratories, Ross Laboratories Division v. NLRB*, 540 F.2d 662, 665 n. 1 (4th Cir.1976), and, since review ultimately may be obtained in a federal court, the Board's decision to appoint a Hearing Officer to hear the charges is a reasonable exercise of its discretion.

which has the appearance of doing so constitutes ground for a new election. We therefore must determine here whether substantial evidence supports the Board's refusal to set aside the election based on the allegedly improper conduct of its agents.

The propriety of the Board's conclusion that the alleged misconduct did not warrant a new election turns to a great extent upon the credibility determinations made by the Hearing Examiner. These credibility determinations should "not be overturned by a reviewing court absent extraordinary circumstances." *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 687 (7th Cir.1982) (discussing credibility determinations, including assessments of demeanor, made by an ALJ). Such circumstances exist only where bias is shown or where there is a "complete disregard for sworn testimony." *Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 795 (7th Cir.1979) (citation omitted). The Company here has not demonstrated that the Hearing Officer harbored anti-employer bias. Rather, the Hearing Officer arrived at her conclusion to exonerate Board agents of misconduct primarily because of her mistrust of the key Company witness, Borgerson. For example, she commented on Borgerson's credibility as follows:

"He impressed me as a witness predisposed to exaggeration with a dramatic flair, in the favor of the Employer, toward which Borgerson had an obvious bias. Elements including his demeanor, recent supervisory promotion and evident feeling of superiority to his co-workers due to his bilingual abilities and relative advanced education, support my conclusion that much of Borgerson's testimony cannot be taken at face value."

The Hearing Officer's decision to believe the Board agents' version of the events as opposed to that of Borgerson must be accepted as reasonable. She attempted to resolve the seemingly irreconcilable versions of the events as best she could. *See Kopack v. NLRB*, 668 F.2d 946, 954 (7th Cir.1982) (credibility determinations based on witness' demeanor accorded the most deference). Although we might have reached a different conclusion upon hearing the contradictory versions, the fact remains that we were not there and the Hearing Officer was. We are satisfied that the Hearing Officer did not manifest bias. Thus, in reviewing the alleged instances of misconduct, we must accept the Hearing Examiner's factual findings based upon her assessments of demeanor, unless there is a "complete disregard for sworn testimony." *Medline, supra,* 593 F.2d at 795.

The first instance of alleged misconduct took place during the pre-election conference. Goodgal and Wilson convened a meeting of election observers from both the Union and the Company to advise the observers of the voting procedures. Goodgal addressed the group. Wilson then translated her remarks into Spanish. Goodgal allegedly told Borgerson to "shut up" when he attempted to help Wilson translate her remarks into Spanish; yet she allowed Union representatives to help translate her remarks to the group. The Hearing Officer, however, credited testimony which explained the disparate treatment, namely, the Union representatives had asked for permission to help translate Goodgal's remarks after it became apparent that the group did not understand Wilson's translation, whereas, in contrast, Borgerson interrupted Wilson's translation to add his own clarification of Goodgal's instructions. The Board reasonably could have concluded that Goodgal's demeanor at the pre-election conference did not manifest undue partiality toward the Union.

The Company also asserts that Goodgal heaped abuse upon Borgerson during the election itself. Goodgal prohibited even brief discussions between Borgerson and employee voters in the polling area. At times her remonstrances with Borgerson and employees attempting to converse with him probably were impolite. Yet prohibiting all discourse between the parties' observers and voters in the polling area has been Board policy for at least fifteen years.

*Milchem, Inc.,* 170 N.L.R.B. 362 (1968).[3] Since the Company does not contend that Goodgal allowed Union observers to converse with voters in the polling area, its challenge based on this asserted type of misconduct is not persuasive.

■ The Company asserts further that Goodgal badgered an Italian-speaking employee, Emilia Albanito, when she attempted to vote. Albanito, who is illiterate, entered the polling area accompanied by her daughter-in-law, Rita Albanito, also an employee. The Union observer challenged Emilia on the ground that she no longer worked for the Company. Wilson tried to describe the challenge procedure to her in Spanish but Borgerson interrupted to explain that Emilia knew little spoken Spanish or English, just Italian. Goodgal claimed that she knew Italian and tried to communicate with Emilia in that language, refusing to allow Rita to explain the procedure because she was an employee. Goodgal failed in her attempt to communicate, either because Emilia did not understand Goodgal's dialect or, as the Company insists, Goodgal knew insufficient Italian. Goodgal did demonstrate physically the proper procedure and Emilia subsequently cast her ballot. Under these circumstances, we believe that the Board agents used acceptable judgment. *See generally Magic Pan, Inc. v. NLRB,* 627 F.2d 105, 108–09 (7th Cir.1980).

■ The alleged improper assistance by the Board agents to Union observers in challenging voters is more troublesome. Wilson admittedly aided the Union observer Arroyo by clarifying her mistaken identification of employee Howard Suckow who was attempting to vote. The observer had challenged the employee for being a supervisor, but had called him Kim Brussow. Wilson's action, however, was proper; he merely discharged his responsibilities as translator by informing Arroyo that the

name on the challenge list was Brussow, not Suckow.

The Company also asserts that, when Brussow himself arrived later, Goodgal would not permit him to vote, ostensibly because Arroyo was in the washroom even though a subordinate observer was present throughout. After five minutes passed, Goodgal went to the washroom herself to get Arroyo. Arroyo indicated to Wilson that she wanted to challenge Brussow. Wilson communicated the challenge to Brussow. Although Goodgal's action was questionable, Arroyo had been present during the rest of the voting and presumably was in a better position to fulfill the responsibilities as observer than her subordinate. Brussow's name was on the Union's previously compiled challenge list. Wilson's subsequent assistance in effectuating the challenge is not proscribed by Board policy. *NLRB v. Schwartz Brothers, Inc.,* 475 F.2d 926, 929–30 (D.C.Cir.1973).

Another example of alleged aid to Union observers is Borgerson's assertion that Goodgal "bugg[ed] her eyes out", signalling the Union observer to challenge employee Bill Carillo. The Hearing Officer, however, discredited that testimony and ruled that Goodgal had not attempted to signal the Union observer. This is another instance of determination of credibility with which we will not interfere.

The Company adds still another allegation to its litany of asserted instances of misconduct by Board agents, namely, that during the tally Goodgal ordered Company observers back from the table at which she was counting the ballots. It is not disputed, however, that Goodgal also ordered Union representatives back to avoid the crush of people. The Company's representatives did not complain at the time that they could not see the ballots. Their subsequent certification that the vote was tallied properly[4]

---

3. We have noted the Board's rule in *Milchem* with approval. *Magic Pan, Inc. v. NLRB,* 627 F.2d 105, 109 (7th Cir.1980); *Midwest Stock Exchange v. NLRB,* 620 F.2d 629, 633–34 (7th Cir.1980).

4. The Company's representatives signed the tally of ballots which read:

"The undersigned acted as authorized observers in the counting and tabulating of ballots indicated above. We hereby certify that the counting and tabulating were fairly and

also lends credence to the Board's conclusion that Goodgal's conduct was not improper.[5]

Finally, the Company argues that, even if each instance of Board agent misconduct in itself did not warrant invalidation of the election, the aggregate of these incidents impugned the integrity of the election process. The Company's allegations are not to be taken lightly. One might well question whether Goodgal exercised sound judgment on several occasions in supervising the election. As the Board recently emphasized, however, "We must avoid unrealistic standards which insist on improbable purity of word and deed on the part of the parties or Board agents. Otherwise, in any hard-fought campaign involving a large number of voters, it would be impossible to conduct an election which could not be invalidated by a party disappointed in the election results." *Newport News Shipbuilding & Dry Dock Co.,* 239 N.L.R.B. 82, 91 (1978), *aff'd in relevant part,* 594 F.2d 8 (4th Cir.1979). Absent such restraint, the disappointed party could advance so many claims of misconduct after an election that the aggregation of claims alone might give rise to the inference that there had been an appearance of partiality.

■ We hold that the challenged conduct here amounted at most to minor instances of impropriety which neither interfered, nor objectively had the appearance of interfering, with the impartiality of the election. *NLRB v. Fenway Cambridge Motor Hotel, supra,* 601 F.2d at 36; *Newport News Shipbuilding & Dry Dock Co. v. NLRB,* 594 F.2d 8, 12 (4th Cir.1979). We therefore reject the Company's objections to the conduct of the election. *See* note 1 *supra.*

### III.

This brings us to the issue involving the propriety of invalidating the two disputed ballots with extraneous markings. We shall consider each in order.

*Invalidation of Signed Ballot*

Turning to the Board's decision to void the signed ballot of employee Pilar Evanovich, the Company challenges the Board's decision on three grounds: first, that the Board's general practice of invalidating signed ballots has no basis in law; second, that Evanovich signed the ballot because of the confusion generated by the Albanito incident; and third, that after she discovered her mistake Evanovich should have been permitted to vote again subject to subsequent challenge. We are not persuaded by any of these contentions.

■ The Board's rule invalidating signed ballots comes within the wide discretion granted to the Board in fashioning election procedures. As the Supreme Court stated in *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 331 (1946), "The principle of majority rule ... does not foreclose practical adjustments designed to protect the election machinery from the ever-present dangers of abuse and fraud. Indeed, unless such adjustments are made, the democratic process may be perverted." Courts of appeals have recognized that the rule applied by the Board in the instant case is such an adjustment. *E.g., NLRB v. Ideal Laundry & Dry Cleaning Co.,* 330 F.2d 712, 718–19 (10th Cir.1964); *Semi-Steel Casting Co. v. NLRB,* 160 F.2d 388, 392 (8th Cir.), *cert. denied,* 332 U.S. 758 (1947). While invalidating a signed ballot arguably disenfranchises the employee who signed the ballot, the rule provides an overarching protection for the secret ballot. An employee's signature on the ballot raises the inference that either the company or the union coerced the employee into voting and then demanded that the employee sign the ballot as proof. By

accurately done, that the secrecy of the ballots was maintained, and that the results were as indicated above."

**5.** The Company is correct that, during the vote tally, agent Goodgal initially refused to permit the Company to challenge her invalidation of the "smiling face" ballot. Upon learning that the NLRB Casehandling Manual allowed such challenge, however, she changed her mind and permitted the challenge. Such an error is trivial at most.

identifying several voters, the parties involved then can more easily determine how other employees voted. Subsequent to the voting, employees always may waive the privilege of secrecy and announce their choice [6]; yet no one ever can be certain of the vote as actually cast in the privacy of the voting booth unless there are identifying marks on the ballot. We reject the Company's challenge in this respect.

The Company's second ground for challenging the invalidation of the signed ballot may be dismissed summarily. Employee Evanovich asserts that she signed the ballot only when she became flustered due to the confusion stemming from the Albanito incident. While Evanovich was present during the 10 to 15 minute dispute, the Company has not established a link between the incident and Evanovich's action and has failed to demonstrate that the Board agents were to blame for Evanovich's subsequent signature.

Within several hours after signing the ballot, Evanovich realized her mistake and informed the Company labor relations consultant, John Garza. When Garza raised the matter with Goodgal, she informed him that it "was over" because of the Board's finality rule. She refused to allow Evanovich to revote. While there may have been little danger of Evanovich changing her vote, a bright-line rule appears appropriate to ensure that employees are not subjected to untoward pressure after leaving the voting area. We have approved the Board's

rule, *Magic Pan, Inc. v. NLRB, supra,* 627 F.2d at 108, and we adhere to it in the instant case.[7]

█ We hold that the Board properly invalidated the signed ballot of employee Evanovich.

### Invalidation of "Smiling Face" Ballot

The second disputed ballot was marked with a "smiling face" immediately below the properly marked "No" box. If the "smiling face" can be likened to a signature, then that ballot, along with Evanovich's ballot, would come within the Board's prophylactic rule invalidating all ballots which reveal the voter's identity. *E.g., NLRB v. National Truck Rental Co.,* 239 F.2d 422, 426 (D.C.Cir.1956) (voiding ballot with a capital "H" on it), *cert. denied,* 352 U.S. 1016 (1957); *Norris-Thermador Corp.,* 118 N.L.R.B. 1341, 1343–44 (1957) (voiding ballot with number written on it). The Board, however, has never extended its rule to invalidate all ballots with extraneous markings. Rather, it has struck down only those ballots with markings which reasonably may be expected to identify the voter. For example, the Board has held that the danger of identification is minimal when extraneous marks appear to have been inadvertent, *J.L.P. Vending Co.,* 218 N.L.R.B. 794 (1975) (erased line in "No" box), or, of greater relevance to the instant case, when the writing on the ballot merely emphasizes the intent of the voter. *E.g., NLRB v.*

---

6. The Company argues that the Board's rule disenfranchises employees needlessly. It suggests, relying on dictum in *NLRB v. Wrape Forest Industries, Inc.,* 596 F.2d 817, 818 (8th Cir.1979) (en banc), that the Board does not have to disclose to either party the name of the voter who signs. If only the Board knows the identity of the employee, so the Company's argument goes, the risk of abuse in counting signed ballots would be minimal. We doubt that the parties would approve of a procedure whereby the Board would adjudicate their rights on the basis of evidence examined in camera. Indeed, the Company in the instant case manifested such disapproval. *See* 703 F.2d at 1015–16 *supra; see also NLRB v. A.G. Parrott Co.,* 630 F.2d 212, 213–15 (4th Cir.1980)

(emphasizing need for NLRB to allow employer to inspect outcome determinative ballot).

7. The Company requested that the Regional Director provide documents concerning his investigation of the election. It asserts that the General Counsel's subsequent refusal to enforce the Company's subpoena denied it due process. Courts of appeals uniformly have upheld the General Counsel's refusal to disclose sensitive investigative materials. *E.g., NLRB v. Vapor Blast Manufacturing Co.,* 287 F.2d 402, 405–07 (7th Cir.), *cert. denied,* 368 U.S. 823 (1961). Moreover, the Company has not demonstrated that it was prejudiced by the refusal in this instance.

*Martz Chevrolet, Inc.,* 505 F.2d 968, 971 (7th Cir.1974) (ballot counted with "Do I ever" written beneath "Yes" box); *F.J. Stokes Corp.,* 117 N.L.R.B. 951 (1957) (ballot counted with "Hell No" written next to "No" box). Underlying these two examples is the Board's policy assessment that the objective of effectuating employee choice through majority rule outweighs the risk of manipulation inherent in counting ballots with extraneous markings except in cases in which identification of the voter is unavoidable.

■ The question presented here is whether the sketching of a "smiling face" under the "No" vote constitutes an unacceptable risk of voter identification. The Board argues that the determination should be left to the Board in its discretion. Board determinations, however, must be scrutinized for coherence and consistency. *NLRB v. Yeshiva University,* 444 U.S. 672, 691 (1980); Winter, *Judicial Review of Agency Decisions: The Labor Board and the Court,* 1968 Sup.Ct.Rev. 53, 70–71. We hold that the Board's invalidation of the "smiling face" ballot simply cannot be squared with prior Board decisions.

In comparison with the expressions of voter intent that the Board has found acceptable, the "smiling face" logo does not unduly risk revealing the voter's identity. There appears to be more chance of identifying a voter through the penmanship of "Hell No" or "Do I ever" than through the skeletal smiling face sketch. A "smiling face", any more than the expression "Hell No", is not likely to be linked to a particular employee. We cannot say in this case that "the voter apparently *wanted* to be identified with his vote." *I.U.E. (Liberty Coach Co.) v. NLRB,* 418 F.2d 1191, 1202 (D.C.Cir.1969) (citation omitted) (emphasis in original).

Furthermore, the "smiling face" sketch plausibly refers to the contiguous "No" vote, expressing the voter's feelings. Indeed, the Regional Director never attempted to distinguish the "smiling face" from manifestations of voter sentiment. Rather, he concluded cursorily that the markings on the instant ballot "were not inadvertently made and also have the potential to identify the voter."

■ Since there was no proffered justification for the distinction, we hold that the Board abused its discretion in invalidating the "smiling face" ballot, and the "No" vote on the ballot must be included in the tally.

Accordingly, in view of our decision above, the Board on remand must determine the validity of at least some of the challenged ballots which have yet to be counted and then proceed to a final tally.

ENFORCEMENT DENIED; CASE REMANDED.

EXHIBIT A

UNITED STATES OF AMERICA
ESTADOS UNIDOS DE AMERICA
National Labor Relations Board
Junta Nacional De Relaciones Del Trabajo

OFFICIAL SECRET BALLOT
PAPELETA SECRETA OFICIAL
For Certain Employees of
Para Ciertos Empleados Do

SIOUX PRODUCTS, INC.

Do you wish to be represented for purposes of collective bargaining by -
¿Desea usted estar representado para los fines de negociar colectivamente por

PRODUCTION WORKERS UNION OF CHICAGO AND VICINITY, LOCAL 707,
an affiliate of the NATIONAL PRODUCTION WORKERS UNION

MARK AN "X" IN THE SQUARE OF YOUR CHOICE
MARQUESE CON UNA "X" DENTRO DEL CUADRO DE SU SELECCION

YES · NO
SI NO

DO NOT SIGN THIS BALLOT. Fold and drop in ballot box.
NO FIRME ESTA PAPELETA. Dóblela y deposítela en la urna electoral.
If you spoil this ballot return it to the Board Agent for a new one.
Si usted daña esta papeleta devuélvala al Agente de la Junta y pídale una nueva.