204 F.3d 1163 (D.C. Cir. 2000)
 North of Market Senior Services, Inc.,Petitioner
v.
National Labor Relations Board, Respondent
 No. 99-1178
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued January 28, 2000
Decided March 10, 2000
 
 [Copyrighted Material Omitted]
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board
 Paul B. Johnson argued the cause and filed the briefs for petitioner.
 Sonya Spielberg, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel.
 Peter D. Winkler, Supervisory Attorney, entered an appearance.
 Before: Edwards, Chief Judge, Ginsburg, Circuit Judge, and Buckley, Senior Circuit Judge.
 Opinion for the Court filed by Chief Judge Edwards.
 Edwards, Chief Judge:
 
 
 1
 The petitioner in this case, North of Market Senior Services ("North of Market"), a medical care provider for low-income senior citizens, challenges the National Labor Relations Board's ("Board" or "NLRB") order requiring it to bargain with the Service Employees International Union, Local 790 ("Union"). Following a representation election held on January 6, 1998, the Union was certified on September 28, 1998, as the exclusive bargaining agent for a unit of employees at North of Market. The employer's objections to the election were considered, without a hearing, and overruled by the Board's Regional Director in a written Report that was subsequently adopted by a three-member panel of the Board, over one dissent. Board Member Peter Hurtgen dissented from the Board's failure to provide a hearing on two of the objections raised by North of Market. North of Market then refused to bargain, prompting the issuance of an unfair labor practice complaint by the Board's General Counsel. On Motion for Summary Judgment, a three-member panel of the Board found that North of Market had unlawfully refused to bargain, in violation of sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act, and ordered the employer to bargain with the Union as the employees' exclusive representative.
 
 
 2
 The Board now seeks enforcement of its order. North of Market, in turn, argues that certain impermissible actions of the Board's agent who conducted the election and Union representatives who were present during the balloting process so tainted the election procedure that the results should be set aside or, at a minimum, the case should be remanded for a hearing on the employer's objections.
 
 
 3
 On the morning of the election, the Board agent who conducted the election sent Union agents into North of Market's facilities to tell employees that they could vote between 11:00 a.m. and 1:00 p.m. For approximately half an hour, the Union agents walked through the employer's facilities, telling employees that they had been sent by the Board to tell them when the polls were open. The Union agents even went so far as to walk into private medical examination rooms where patients were being examined. As the Union agents talked with employees on the employer's premises, they openly rejected a manager's assertion that employees needed to take their lunch break to vote. The manager who accompanied the Union agents filed a declaration saying that she was "powerless to stop this rampage through [the employer's] facility or to counter what the union agents were doing or saying." Decl. of Gloria Valoris, reprinted in Deferred Appendix ("D.A.") 85.
 
 
 4
 North of Market contends that the election should be invalidated, because the disputed conduct impugned the integrity of the election and interfered with the employees' free and uncoerced choice in the election. North of Market argues, in the alternative, that, at the very least, the Board erred in denying it a hearing on its objections. We agree. When a party objecting to an election presents specific, prima facie evidence that an election is invalid, the Board is required to hold a hearing. See 29 C.F.R. 102.69(d) (1999);Swing Staging, Inc. v. NLRB, 994 F.2d 859, 862 (D.C. Cir. 1993). North of Market has presented such evidence in this case. Thus, the petition for review is granted in part and the case is remanded. On remand, the Board must either invalidate the election results and schedule a new election or hold a hearing on the objections raised by North of Market to determine whether to hold a new election.
 
 I. Background
 
 5
 In the fall of 1997, the Union began a campaign to organize the employees of North of Market's San Francisco facility. On November 24, 1997, the Union filed a petition to represent the employees of that facility. The election was set for January 6, 1998. North of Market complains about a number of different incidents surrounding the election. However, only two charges raised by North of Market--the claims that the actions of the Board agent and Union representatives destroyed the integrity of the election and interfered with free and uncoerced voting--warrant our attention.
 
 
 6
 On the morning of the election, Board Agent Wayne Chin held a pre-election conference with Gloria Valoris, the Executive Director of North of Market, and Union organizers Jen Lai and Louisa Blue. The description of the events that follows is gleaned entirely from Gloria Valoris' perspective, as her affidavit and declaration are the only evidence in the record as to what happened that morning. According to Ms. Valoris, Jen Lai told Mr. Chin that she had heard that supervisors were telling employees that they could only vote on their lunch hour between 12:00 p.m. and 1:00 p.m. If this was true, it was wrong, because the polls were scheduled to be open from 11:00 a.m. to 1:00 p.m. Ms. Valoris asserted that it was not true. She said that employees had been told that they had to vote during their lunch break, but that they could take their lunch hour any time between 11:00 a.m. and 1:00 p.m. At this point, with the polls opening in less than half an hour, Mr. Chin made a poor judgment call.
 
 
 7
 Mr. Chin decided that the employees should be informed about the correct voting time. At first he considered sending Ms. Valoris into the facility to deliver the message to the employees. Then he changed his mind and told her that she should have a non-supervisor make the announcement. He changed his mind again and settled on a final course of action:"He ... said that the two union agents should make the announcement to employees that they could vote any time between 11 and 1." Aff. of Gloria Valoris, reprinted in D.A. 90-91. Ms. Valoris states that it was her "impression that [she] was to just escort them through the office to show them where employees were working." Id. at 90.
 
 
 8
 The Union agents apparently were not shy in carrying out their assignment: Wearing their Union insignia in full view, they patted employees on the arm or back, shook their hands like good buddies, and told them that they had been sent by the NLRB to say that employees could vote any time between 11 and 1. The Union agents added that employees did not need to take their lunch break to vote. This was contrary to Ms. Valoris' view, and she followed the Union agents around telling employees that they could take their lunch any time between 11 and 1, but that they did have to take their lunch to vote. The Union agents, however, frustrated her efforts to get that message across. "Whenever I would make that statement," she said, "the union agents would contradict my instructions, telling employees that they had been sent by the Board agent to tell them that they could vote whenever they wanted and it did not have to be on their lunch hour." Decl. of Gloria Valoris, reprinted in D.A. 85. All of this took place from approximately 10:50 a.m. until 11:15 a.m., fifteen minutes into the election.
 
 
 9
 During this time, the Union agents also walked into patient examination rooms, delivering their message to the employees there. According to Ms. Valoris, "[t]hey barged into exam rooms unannounced and without any permission from me."Id. Ms. Valoris says that elderly patients were being treated in these rooms and that some of them were in various states of undress. Ms. Valoris states that she "was powerless to stop this rampage through our facility or to counter what the union agents were doing and saying, particularly in light of their repeated statement to employees that they had been sent by the NLRB." Id. The election otherwise continued as planned.
 
 
 10
 The Union won by a vote of 15 to 11, and North of Market filed timely objections to the election. The Regional Director investigated, but held no hearing, and recommended overruling the objections. The Board, with one member dissenting, adopted the Regional Director's findings and recommendations. North of Market Senior Servs. Inc., Case No. 20-RC17350 (Sept. 28, 1998). The dissenting member believed that the conduct described above warranted a hearing. Id. at 2 n.2. The Union was certified, but North of Market, in order to obtain judicial review of the decision to certify the Union, refused to bargain. An unfair labor complaint was issued against North of Market. The Board, on a Motion for Summary Judgment, held that North of Market violated 29 U.S.C. 158(a)(1) and (5) and ordered North of Market to bargain with the Union. North of Market Senior Servs., Inc., 327 N.L.R.B. No. 197 (Mar. 24, 1999). This appeal followed.
 
 III. Discussion
 
 11
 The Board's discretion to assess the propriety and results of representation elections is broad. Thus, it is well established that a court will overturn a Board decision to certify an election in only the rarest of circumstances. See E.N. Bisso & Son, Inc. v. NLRB, 84 F.3d 1443, 1445 (D.C. Cir. 1996). A party seeking to overturn an election bears a heavy burden of showing that the election is invalid. See Swing Staging, Inc. v. NLRB, 994 F.2d 859, 861 (D.C. Cir. 1993). But a party who "raises substantial and material issues of fact sufficient to support a prima facie showing of objectionable conduct," is entitled to an evidentiary hearing. Id. (citing 29 C.F.R. 102.69(d) (1999)). This evidence cannot be conclusory but "must point to specific events and specific people." Id. (citations and internal quotation marks omitted).
 
 
 12
 North of Market presented such specific evidence here, yet the Board in this case declined to hold a hearing. North of Market filed six objections with the Board and supported those objections with specific evidence of wrong-doing. Among the objections, North of Market argued that the Board agent's decision to send the Union agents into the employer's facility and the Union agents' subsequent behavior impugned the integrity of the election and interfered with the employees' free and uncoerced voting. And while we agree with the Board's decision to reject most of North of Market's objections, these two objections raise substantial issues that should have been addressed by the Board.
 
 A. The Integrity of the Election
 
 13
 The Board attempts, as near as possible, to hold elections in a laboratory condition. See NLRB v. Schwartz Bros., Inc., 475 F.2d 926, 930 (D.C. Cir. 1973); General Shoe Corp., 77 N.L.R.B. 124, 127 (1948). This requires the Board and its agents to maintain an appearance of neutrality in conducting fair and impartial elections. See, e.g., Sioux Products, Inc. v. NLRB, 703 F.2d 1010, 1013-14 (7th Cir. 1983). Obviously, Board agents in charge of elections have a responsibility to uphold this standard. Thus, if a Board agent acts in a way to "destroy confidence in the Board's election process, or [in a way that] could reasonably be interpreted as impugning the election standards," the election must be set aside. Id. at 1013 (citations and internal quotation marks omitted).
 
 
 14
 A Board agent can destroy confidence in the election in a number of different ways: by creating questions about the integrity of the ballot box, see Austill Waxed Paper Co., 169 N.L.R.B. 1109, 1109-1110 (1968) (invalidating an election, because the ballot box was left unsealed and unattended for from two to five minutes); by fraternizing with one party to the election, see Athbro Precision Eng'g Corp., 166 N.L.R.B. 966, 966 (1967), vacated sub nom. Electrical Workers IUE v. NLRB, 67 L.R.R.M. 2361 (D.D.C. 1968), acq. 171 N.L.R.B. 21 (1968), enf'd. 423 F.2d 573 (1st Cir. 1970) (invalidating an election, because Board agent was seen having a beer with Union agent between polling periods); or by delegating nonminor official election duties to a party, see Alco Iron & Metal Co., 269 N.L.R.B. 590, 591-92 (1984) (invalidating election, because Board agent delegated task of translating voting instructions to Union observer). It is this last cited conduct that is at issue here.
 
 
 15
 The Board agent in this case delegated to Union officials the task of telling employees when they could vote in the representation election. In other words, there is no doubt that an official election task was impermissibly assigned to a party. The question here is whether this delegation compromised the integrity of the election. The Board traditionally has considered such questions on a case-by-case basis, weighing the importance of the delegated task, the manner in which it was assigned and performed, and its likely effect on the required appearance of neutrality. For example, in Alco, the Board determined that the integrity of the election was compromised when the Board agent delegated the task of translating ballots to the Union's observer. 269 N.L.R.B. at 591-92. The Board stated that "[t]he delegation of an important part of the election process to the Petitioner's observer conveyed the impression that the Petitioner, and not the Board, was responsible for running the election." Id. This conduct, the Board held, was "incompatible with [its] responsibility for assuring properly conducted elections," and necessitated overturning the election. Id. at 592. However, in San Francisco Sausage Co., 291 N.L.R.B. 384 (1988), the integrity of the election was found not to have been compromised when the Board agent delegated the task of announcing, over an intercom, that voting had begun. That, the Board held, "was a delegation of a minor task" that was performed in an innocuous way and so did not necessitate overturning the election. San Francisco Sausage, 291 N.L.R.B. at 384 n.1.
 
 
 16
 Here, the Board agent's delegation raised a serious threat to the integrity of the election, because it resulted in Union agents tromping through the employer's facility, on the direct authority of an official from the NLRB, during the precious moments before the polls opened. There is no doubt that simply delegating the task of telling employees when to vote does not impugn the integrity of an election. See, e.g., San Francisco Sausage, 291 N.L.R.B. at 384 n.1. However, unlike San Francisco Sausage, where the party made only a brief announcement over an intercom, the Union agents in this case, in full Union regalia, announced that they were sent by the NLRB, then personally and warmly greeted each employee and told them when they could vote. And the Union agents added insult to injury by openly refuting a management official's instruction regarding employees' lunch breaks. It was strange at best for Union officials to be wandering through the employer's work areas, with no assent from the employer and on the proclaimed authority of the NLRB. This certainly may have given the impression that the Board had ceded significant authority to the Union over the conduct of the election.
 
 
 17
 In short, North of Market has presented a compelling case, and certainly a prima facie one, that the integrity of the election was impugned when the Board agent sent Union officials into the employer's facility to tell employees when to vote. And the vigor with which the Union agents carried out the task, flaunting their new found "authority" to speak for the Board, while openly disagreeing with a management official, made the situation even worse. The Board erred in denying North of Market a hearing on this objection.
 
 
 18
 B.Interference with Free and Uncoerced Voting
 
 
 19
 Likewise, the Board erred in summarily rejecting the objection that the Union agents' tour through the facilities and open disagreements with a management official necessitated invalidating the election. An election is invalid if the actions of a party to the election "reasonably tend[ed] to interfere with the employees' free and uncoerced choice in the election." Family Serv. Agency v. NLRB, 163 F.3d 1369, 1383 (D.C. Cir. 1999) (citations and internal quotation marks omitted). The employees' free and uncoerced choice in an election may be interfered with by actions that create the impression that an employer is not in control of its own facilities and is not able to stand up to the Union. See Phillips Chrysler Plymouth, Inc., 304 N.L.R.B. 16 (1991).
 
 
 20
 In Phillips, the Board invalidated an election where Union agents refused to leave the employer's property and engaged in a shouting match with the employer in front of employees an hour before the polls opened. Because this "direct challenge to the Employer's assertion of its property rights" and the message that "the Employer was powerless to protect its own legal rights in a confrontation with the Union" could not have been lost on the employees, the Board held that the Union's conduct interfered with the employees' free and uncoerced choice. Phillips Chrysler, 304 N.L.R.B. at 16.
 
 
 21
 Similarly, in this case, North of Market has raised significant issues regarding the Union's improper invasion of its property and the resulting impression that the employer was helpless to control the situation. First, not only did the Union agents walk around the employer's facility without the employer's permission, but they walked into private examination rooms where patients were in a state of undress. The Union agents' unhindered access to the facilities and the examining rooms surely could have been seen as a challenge to North of Market's property rights. Second, the Union agents repeatedly disagreed with Ms. Valoris: She told employees that they had to vote on their lunch break, but the Union agents told employees that they did not have to vote during their lunch hour. This disagreement could well have given employees the impression that North of Market was unable to protect its rights in a dispute with the Union. This is especially true given that the Union agents purported to be speaking for the Board when they disagreed with the employer.
 
 
 22
 Moreover, we scrutinize this misconduct more closely both because it took place on the day of the election, see Family Serv. Agency, 163 F.3d at 1383 (noting that argument between employer and union did not necessitate invalidating the election in part because election was at least a month away from the time the argument occurred); NLRB v. Earle Indus., Inc., 999 F.2d 1268, 1274 (8th Cir. 1993) (holding that conduct did not violate Phillips Chrysler, in part because it took place weeks before the election), and because the Union's margin of victory was narrow, see C.J. Krehbiel Co. v. NLRB, 844 F.2d 880, 884 (D.C. Cir. 1988) (carefully scrutinizing the election, because the vote was close); United Steel Workers v. NLRB, 496 F.2d 1342, 1347 n. 11 (5th Cir. 1974) ("If the vote margin in a representational election is very narrow, minor violations should be more closely scrutinized.").
 
 
 23
 In light of the record at hand and considering the principles underlying Phillips Chrysler, we conclude that North of Market was at least entitled to a hearing on this issue.Accordingly, the case will be remanded for further consideration by the Board, either to conduct of a new election or for a hearing on the employer's objections. If a hearing is held, the Board must specifically address the application of Phillips Chrysler to this case.
 
 III. Conclusion
 
 24
 For the reasons given above, the Board's request for enforcement is denied, the petition for review is granted in part, and the case is remanded to the Board. On remand, the Board may conclude that the present record is sufficient without more to show that the integrity of the election was compromised and/or that the employees' free and uncoerced choice was impaired so as to justify a new election. At a minimum, however, the Board must conduct a hearing to address these two charges raised by the employer.